Good morning. I'm pleased to be here with William Lloyd for Appellant and Appellee of Defendant Milon-Digiorgio Enterprises, DBA, ISP West, with Howard Posner at the Council Table. You represent Milon-Digiorgio? Milon-Digiorgio. The names, it's easier for us to do it that way because of the nature of this. This is very simply a matter between two internet service providers, both of whom were competing in the same area of San Fernando Valley, both doing the same business, providing connection to the internet, providing web services, web hosting, and various other related services. Defendants, or plaintiffs, became aware of the existence of ispwest.com and ISP West in 1998, late 1998 when it started being used, and did nothing until March of 2005. Their businesses were different at that time, is that right? No, they were not. They were the same. Were you both providers of email services and on-ramps to the internet? Yes, both companies. We were both, and ISP, we both had services where, other than... ISP, Internet Service Provider. We were both ISPs, yes. You mean, that means Internet Service Provider? Internet Service Provider, that's for sure. I can get on to the Internet Service Provider, and that lets me go to Slade or Map Drudge or something like that, and it also lets me send and receive email, and you both did that? Both of us did that. But you were doing it by dial-up, is that right? Yes, I am. And their procedure was different? No, they were doing it by dial-up as well. Were they doing DSL at that point, too? I think they started DSL in 2000, after 1998, when they became aware of it. So you mean, you both did dial-up originally, and then they went on high-speed before you did it? And the distinction... Yes, we both... My question is really what I'm interested in. I want to know, I know you've got something else you want to talk about, but what I want to know is, did you both start out selling dial-up service to get on the net and do email, and then they went to high-speed internet earlier than you did? Yes, but there's more to it than that. Yes, Your Honor. They started... We both started doing dial-up, and even... I'm not even sure now, but even as far as internet specialties is concerned, but even now there is a dial-up community, and everybody's still offering dial-up. If you live outside, I think you have to be within three miles of the switch to get DSL. Right. And in order to get high-speed, if you're not within three miles of the switch, you need a dish to receive a signal. Is that right? There's some more technology to it, but that's one of the ways, yes. They've actually come up with some ways where you can actually, they can put repeaters in the phone lines and move you even further distances away from... Then you need to be within three miles of the repeater. Right. That's basically an amplifier. Yes. Now, so you both still provide dial-up? As far as I know, no. As of trial... People that are more than three miles from a switch or a repeater? Or in my case, as a lot of people will do, I keep a backup dial-up account in case something happens with the phone companies of the DSL. I do, too. I do, too. A lot of people do, because I can't get DSL. I've got a dish. And you still have to have it. And the real distinction between dial-up and DSL is nothing more than speed, if you will, and the proliferation of that. Everybody was providing Internet access through a connection to the Internet. Be that Internet connection, a dial-up connection, a DSL, which is digital subscriber line, essentially. Let me ask you something else that's on my mind. Under the injunction, if we affirm the injunction, do all your customers have to change their e-mail address? They were required to because of the injunction. They have been required to. Otherwise, we actually paid some sanctions because we didn't do it fast enough. Is that the kind of harm that the courts say would be prejudiced to you? Yes. Now, what's your authority? I guess that's really a factual interpretation, because we're dealing in something of this nature. Because of the newness of this, there has to be some harm to us from my client standpoint, from the harm if you're doing the e-systems analysis. And that harm would be the loss of the customers that we did lose. That's not necessarily in the record, because this all occurred after the decision. But the reality is, I don't know of any case that says, okay, it is harm to lose customers for an ISP. But basic logic says, if you've got a customer base and you're upsetting that customer base, and people are going to go away, which Mr. Mulong suggested was at least 10% of the customers, would go away because we were required to change the name, then, in fact, that would be harm. Let me ask you about harm in another respect. Ordinarily, the way the test is put in this type of infringement case is you look at the harm to Giorgio in this case. That's correct. In an ordinary injunction case where you use the four-part test, part four is the public interest. And not being an Internet service provider myself, but being an Internet user, I think of the public as me when I'm using the Internet. And it's a big nuisance if I have to change my e-mail address. Can we use the four-part test and consider the harm to the customers of having to change their addresses? Or are we limited to a special test for infringement, even though it's an injunction? And can we not consider the harm to the customers? I guess I'm asking the question. My question becomes when you're speaking in terms of the e-systems analysis of harm with regard to the application of latches. That's right. One time the Supreme Court corrected us. We were using a special test for environmental injunctions. And they said, nope, you do the usual type of equitable analysis of injunctions. And if you did that, you'd consider the public interest. And in this area of infringement, no one's ever said that. And all the cases just use harm to the parties. I'm wondering if the four-part test nevertheless applies if the occasion arises. Or whether it – can I rephrase it a little bit? Go ahead. The e-systems analysis was the six parts are not exclusive. It says – and I've got it right here in front of me. It says citing Carl Zeiss and it's under Section 2 of the brief. It looks like it's at page 607, 608. The decision says specifically that the Carl Zeiss case lists the following among the factors to be determined whether latches will bar relief. It doesn't say that those six factors are the only factors to bar relief. So my thought would be that this Court could utilize even the harm to third parties as one of the factors that the Court should look at to determine whether there was harm in this particular circumstance. Did you need to prove some brand recognition in order to show harm? I don't believe so. And here's the reason I don't believe so. There's nothing in e-systems that says there needs to be specific brand recognitions. And latches is not a defense that depends upon brand recognition. What it depends upon from the harm standpoint, which would be kind of related to it, would be the classic of latches, which I believe this case is. You learn about somebody's existence. You know that they're conducting business in the same area you are. You sit on your laurels for six years, six and change, and then finally go ahead and do it. During that interim, the company goes from tiny to spending over $2 million in advertising and goes from small, under 2,000 users, to 13,000 users. These are people that are signed up with them as customers. This is the numbers from the case. And you've grown to this level. Now whether that's branded or not, whether you're Kleenex or Coca-Cola or not, doesn't really become relevant to making the determination that there was injury or harm to you or would be to you. Am I making sense with that? Well, traditionally, one would have to find brand recognition and harm to it in order to succeed in the traditional case. If it's a trademark. But this is if you're finding in a trademark case where there has to be harm to the trademark. But here you're dealing with the equitable defense of the wrong attempted being perpetrated by a plaintiff in sitting on their laurels, which doesn't, to me, require brand recognition to prove that there was some injury to the defendant during that time frame. I think it's setting up a false standard and mixing two different factors. Latches exist by itself independent of, and the standards for latches exist independent of the standards for proof of harm to a trademark itself. Counsel, did your client and the other providers serve the same clientele? There was some indication that your client served residential customers and the other business served business customers. Would you agree with that? No, not at all. There was an attempt to make that distinction as a justification. Apparently, it had some sense to the court. And that was we focus on or we provide to. But if you look at all of the record and nobody in there says, we're just, there's no advertising. There's nothing that says we're your business provider from the standpoint of As a matter of record, were the bulk of your customers residential and the bulk of the other providers' customers' business? Yes. As a matter of record. As a matter of record. But it was merely, the problem there is it's just the bulk of those. And if there's, when you're looking at it from the trademark standpoint, if there's confusion, and if from the commencement of latches, which really to me is the issue here where the court decided 2004 at the DSL, that's the critical issue. Well, that goes to the issue of whether or not you're providing the same or different services to them. But providing services is providing the services. The customer can use them. I use one account. I use it at home. I use it at my office. Well, you're in competition. I mean, if you're in competition for a customer base that's residential as opposed to a customer base that's business, to me that's not the same business. But there's nothing, I understand that concept. But there's nothing in here to say that both companies weren't providing to both customers and residential. They were competing head to head. Nothing in the record that shows what kind of customers each had? There was, there is some testimony during trial that there were more, that from the defense, the self-serving, we really focus on business customers. But none of their advertising is directed just to business customers. None of their, the way they did the business, and they admitted that they did have residential customers. And from the flip side, nothing in ISP West or Milan Di Giorgio's advertising limited itself to residential customers. It would do business with both residential and business customers. Wouldn't the nature of the service provided in a way naturally cause gravitation to one or the other? Because most business companies are going to want either DSL or a T1 line. Potentially. Potentially. I think now that's belied by everybody wants DSL or cable modem or whatever. There would be some difference, but then again, it depends on where you're physically located, whether you can get a DSL line if you're close enough to the phone company. Because none of that is controlled by the companies. It's controlled by your distance from the office and your mileage and whether the line is good, in between all sorts of various other reasons, or you have to go satellite. But the reality is, I guess the analogy is, if there's a hamburger joint down the street from a steakhouse, and one's called Smith's and one's called Smitty's, is the hamburger joint still competing in reducing the name value of Smith's Steakhouse? Well, that's the meat and cheese case. Yes, it is. It's the meat and cheese case, or if you're Grupo Gigante in Tijuana versus San Diego, the reality is you're still providing the same things. You're still providing connection to the Internet. I think in Grupo Gigante, didn't we say that the Grupo Gigante stores that the Dallow Brothers started in San Diego get to stay in business because the big Grupo Gigante in Mexico City knew all about them and decided they weren't big enough to matter? Absolutely. And that's really what we have right here. Let me ask you. They're the little guys. They're the big guys. We're the little guys. I know we've used up your time, but I wanted to ask one practical question. What has happened since the judgment? Have you actually changed, made all your customers change their... Well, our choice was either switch over or it was $250 or $1,000 a day. Okay, so you have changed. Yes, we had to. So do you want to change back? Absolutely. Absolutely. It's a better name. It's a good name. What's the name you've changed to? ACE Web, A-C-E-W-E-B. And if you think about it, and this is if you were speaking in terms of the damage question, the damage issue, how we are damaged, ISP and West has a certain character to it. It says we're an ISP. It says we're out here in the West, whereas ACE Web just doesn't do that. The loss of that name to us is significant and still is. Why would you want to change back? Wouldn't you lose customers again? We'd be able to keep ACE Web customers alive and still the ones that had switched over. Oh, so they could keep their ACE Web address and it would just get automatically routed? Yes, or we can keep both of them up. I mean, all of this is, to me, the certain insanity of it is it's all like 64.267.42.3. None of it is the words. That's what the changeover is. This is all controlled by numbers in the computers. So if you change back, your ACE Web customers don't have to change their email address. Absolutely not. But when you had to change from ISP West or IS West, they did have to change their email addresses. And we lost customers. And, you know, we lost name recognition. That's not part of the record, but I just was, I think, exploring beyond. We've used up your time. Yes, I guess we have. Thank you. Thank you. Good morning, Your Honors. May it please the Court. William Delgado on behalf of Plaintiff Appellee Cross-Appellant, Internet Specialties West. Help me with my problem on this. Many of us have been playing with computers for a while now. I remember using Dial-Up to CompuServe in 1980. And back then you didn't have graphics. You had 300 baud modems that worked fine. And then it went to 1,200 baud modems, and it was just great because it was all text. It would come in as fast as, faster than you could read it. 300, it was slower than you could read it. Then when they started putting graphics on them, the 1,200 baud was no good anymore, and you got the 56 baud, or 56K, Dial-Up modems. Usually you wouldn't get a full 56K because of the line quality. And they started making the sites more and more graphics heavy. So if you could, you'd get DSL or T1. I don't remember T1 for Resident or DSL. And then when people started catalog shopping and getting iTunes and whatnot, pretty much everyone wanted DSL because Dial-Up just wasn't very practical. If I'm understanding the evidence correctly in this case, both companies did those things. They went through just that evolution from Dial-Up to T1 and DSL, and both of them still do Dial-Up, which people use when their DSL connection goes down. Is there some real difference in what the companies do? I think there are three real differences, and I think that's what the companies have relied upon when they make a conclusion. I think that's the first. I think there's a difference in the type of customer versus a residential customer who is going to get Dial-Up versus a— Well, some things really differ by that. For example, with Westlaw, it used to be that you had a monthly minimum. So if you were a solo practitioner, it wasn't practical to get a Westlaw account. If you were a big firm, it was. But with the Internet, I don't understand what the difference is. You may pay a little more for higher upload speed. Maybe you pay a little more for more bandwidth. But I don't understand that. I think we use the same Internet service providers in businesses and personally. I think we may even use the same one on the government line. Getting back to what I was saying, I think there is a difference in terms of customers. Residential customers that get a Dial-Up line are not going to get a T1 business line. Conversely, a business that's going to get a T1 line can't rely on a Dial-Up line. I don't remember T1 being provided to residential. Is it provided to residential? It can be provided to whomever wants it. I know it can be, but is it? I don't believe so. But lots of customers, pretty much anyone who can get it gets DSL. Isn't that right? I'm sorry, can you repeat your question? Pretty much any residential customer that can get it gets DSL, don't they? Well, I think that's beyond the scope. If you're talking generally, I don't know. I would imagine that these days that's probably a fair assumption. You can't really do any catalog shopping or use iTunes without it. Well, you could. I mean, technologically you could. You could get one tune overnight. It would take forever, but you could do it. There's a difference, though, also in technology. Dial-Up, as you noted, is a mobile technology. DSL and T1 is a static. You can only get it at a particular location. You can't take it with you. And, of course, there's a huge difference in cost, Dial-Up being relatively inexpensive, business class DSL and business class T1 being very expensive. But let me point out that it wasn't just the plaintiff who was advancing these differences. I'm looking at Supplemental Excerpt of Record Page 253, which is a page from the defendant's brief in opposition to our motion for summary judgment. And there, in order to avoid a fine and liability, they state, there are material differences between the parties' services, with plaintiff being focused much more on business class customers and their needs, such as server co-location and website hosting, than defendant, who is more, quote, unquote, consumer. The word focus just doesn't do it for me. I mean, in business, you may order all your business supplies from Quill, and then Sam's opens up in your town, and you can get it more conveniently from Sam's. So you switch, even though Sam's is oriented more toward individual consumers. Now, business can do whatever is advantageous, and so can the customer, right? Well, I guess what I'm interested in, what's in this record? Okay. Well, I think the difference here, Your Honor, is that the question is not, I think the question is that the district court abused its discretion or had clear error in finding that there was a difference. And on this record, I don't think that can be the case. Here's my real, the core of my problem. To me, it looks a lot like that cheese case that we had, Tillamook, and like Grupo Gigante. It looks like your company knows perfectly well about the other company, but figures they're too small to be a serious competitor. And it just does nothing about them for six years while they grow and get more and more customer goodwill, more and more customers. And then when they start being a serious competitor, bam, lawsuit. And our line of authority says you run latches from when you knew about them, which was six years ago. And the fact that they were small then and bigger now cuts against you instead of for you because it means there's more prejudice to them. Well, Your Honor, I think there are significant differences between Grupo Gigante and Tillamook. And both of those have one particular distinction that I particularly want to address, and it's that there was detrimental reliance by the defendant on an act by the plaintiff. Well, the detrimental reliance is continuing to grow and build customer goodwill. That's what we said in those cases. Well, I'm not quite sure that that's the case, Your Honor. I think if we start with AIG where the court, the majority panel in AIG said detrimental reliance has to be that the defendant knew of the plaintiff, not that the plaintiff knew of the defendant. Here the defendant didn't know of the plaintiff. So under AIG, which predates ease and I think with control, you can't have a finding of detrimental reliance. Wait a minute. You're saying that they're more guilty because they never knew they were encroaching. Well, under AIG, which is the case that would control, that is the suggestion. It's basically if you can't show detrimental reliance, then you can't meet the standard. Well, the reliance is not reliance on being able to get away with the encroachment. The reliance is reliance on being able to use their own name in business and grow and build customer goodwill. Your theory of reliance is relying on, hey, we've gotten away with it for this long. That must mean they're not going to sue us. I don't think that's what the case is, ma'am. No, Your Honor. And if that's what Your Honor understood, I apologize because that's not my theory on detrimental reliance. If we look at Tillamook, the plaintiff in that case took the defendant's product and put it in their own catalog and said, this is our beef. The defendant, the beef seller, is entitled to detrimentally rely on that statement and the plaintiff's action in creating an association between the two products. In Grupo Gigante, you had the Mexican chain meeting with the Dallos in 1998 and telling them, you have got to stop this infringement. The Dallos communicating to them, we will not stop this infringement. And that's what Professor McCarthy calls the calling of the bluff. At that point, the Dallos were allowed to detrimentally rely on the failure of Grupo Gigante, the Mexican supermarket, and their failure to do nothing. So under your theory, if somebody perfectly innocently builds a business under a name that unbeknownst to them is like somebody else's name, and they grow over the years, and the person they don't know about does know all about them, then there's no latches. There is no acquiescence. Let me ask you to turn to the issue of harm just for the moment and assume that there was lack of diligence and that probably if there was harm, latches would apply. Well, on the issue of harm, Your Honor, I think we've heard, and the only evidence that was put forward at trial was the evidence of harm that would result as a result of losing the case. In other words, we had the injunction in place. Now we have to change our email. We have to change our servers. Not evidence of harm as a result of the delay itself. And that's the crucial distinction. In general formulas, the Ninth Circuit made very clear, we're not talking about harm as a result of litigation. We're talking about harm as a result of the delay. Well, now they're saying that it would cause them loss of customers. Now, was that from the delay or not? Well, I think if you, let's assume that latches started in 1998, such that the four-year period from the statute of limitations expired in 2002. If we look to see what kind of company they were in 2002 and the kind of company they were when the injunction was put in place in 2006, it was essentially the same company in terms of very similar customer numbers, very similar revenues, very similar profits. So it cannot be that the change in email addresses and the loss of customers was a result of the delay. So we don't compare 1998? We compare 2002 to the current? I think you have to. I think to say that you compare 1998 would set up a standard where the putative trademark plaintiff would have to face an election of rushing to court immediately upon just the slightest infringement versus giving them a reasonable chance to evaluate whether or not they should bring the case in the first place, which is what every other circuit does. So that's where you get the four years? Yes, Your Honor. I thought most big companies did keep their eyes open for infringement and sent a nasty letter as soon as they discovered one. Well, that may be true about most big companies, but let's not forget, Plaintiff was not a big company in 1998. It was itself a start-up with a choice with the paradigm or the Hobson's choice of filing a $250,000 lawsuit immediately. Well, they didn't have to necessarily file a lawsuit. They could have sent a letter. And now we're getting into speculation, but if the result had been the same as what happened when we filed the lawsuit. The idea is if somebody's encroaching on your name, send them a letter and tell them so. Don't let them continue to build a business for six years. Maybe filing a lawsuit would have been a bit much, but as soon as you knew about it, I don't see why you couldn't send a letter. Well, let's assume that they had sent a letter in 1998 and the defendant had said we're not going to change our name. Now their choice was either filing a lawsuit or being precluded later on from filing that lawsuit by what Professor McGarvey calls bluff reliance. Yes. Well, then you decide are they more likely to go out of business so we don't have to worry about them? Or are they more likely to grow just like us, hopefully? And that was the determination that was made, but I don't think it makes a difference whether or not the letter was sent in the first place or not. But I don't see why you can elect to know that they're using the same name or a confusingly similar name, know all about it, have every reason to think they don't know about you, not tell them a thing, not only not sue them, but also not even tell them that they're using a confusingly similar name, and just wait and see if after they spend millions of dollars for six years if you feel like suing them. Well, Your Honor, and I understand that's where Your Honor is coming from, but the issue is not whether this Court would have made a different determination had it been sitting at the district court level, but whether the district court's opinion and analysis after a multiple-day trial where there were numerous experts constitutes clear error, and the decision was so... Your theory is you're originally competing in different markets. Now, originally, originally not since you were both dialogue, but you got into DSL first. No, Your Honor, in 1998 my client was already into DSL and T1.  That's in the record. That is in the record at supplemental record 157 through 159, and previously supplemental record 130 to 132. Now, I'd like you to comment on what type of harm satisfies the standard when we're looking at prejudice from latches. I think it has to be, in the case of McClure, it has to be the kind of harm that is the... It's the branding kind of harm, because what we're doing with the injunction is we're prohibiting the person from using the trademark. If that person hadn't used the trademark for purposes of their business, there's no harm. If, on the other hand, and this is from Grupo Vigante, I think the statement from Grupo Vigante is that the company had used the trademark to build a valuable business. If there's no evidence of use of the trademark to build a valuable business, no association, no goodwill, which there wasn't any of that in the record here, then there cannot be the kind of harm that we're talking about in the latches analysis. Let me also point out a key distinction in the Grupo Vigante case, which is this. In this case, we are arguing that progressive encroachment applies. Progressive encroachment exists when the defendant moves into the plaintiff's territory. In Grupo Vigante, it was the opposite. The plaintiff came up from Mexico and moved into the defendant's territory. So there the district court said you can't have progressive encroachment because it's the opposite scenario. And, of course, this court affirmed, but it's a completely opposite scenario. It's not progressive encroachment if you have the wrong party moving into the other person's market. I see that my time is actually coming up in just a few seconds, so I'll stop here. Thank you, Your Honor. Thank you, counsel. Internet Specialties v. Nilan DiGiorgio is Does he have some I thought we'd used up the rebuttal time, but I guess If you want to elapse on it, that's okay with me if you have questions. No, I don't know. What's the 307? It's red. That's his overtime? Oh, okay. But if the judge has questions. No, I think we know as much as we need to know. Thank you, counsel. Internet Specialties v. Nilan DiGiorgio is submitted. We're adjourned for the day.
judges: Fletcher, Kleinfeld, Rawlinson